IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NORFOLK DREDGING COMPANY, :
:
      Plaintiff, :
v. :
: Civil Action No.  2:05cv92
JOHN L. WILEY :
:
:
      Defendant. :
_____:

**OPINION and ORDER**

    Seamen who are injured while in service of a vessel are entitled to have the shipowner pay maintenance (financial support) and cure (medical expenses). Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 527-28 (1938).  The shipowner's obligation lasts until such time as the seaman reaches maximum medical improvement ("MMI").  Id. at 527-28; see also Fitzgerald v. U.S. Lines Co., 374 U.S. 16, 20 n.7 (1963); Salem v. United States, 370 U.S. 31, 38 (1962); Vaughn v. Atkinson, 369 U.S. 527, 531 (1962); Carleno v. Marine Transport Lines, 317 F.2d 662, 665-66 (4th Cir. 1963).  MMI occurs "'when it appears probable that further treatment will result in no betterment of the seaman's condition.'" Pelotto v. L & N Towing Co., 604 F.2d 396, 400 (5th Cir. 1979).

    Declaratory defendant John L. Wiley injured his eye while working aboard a vessel owned by declaratory plaintiff Norfolk

Dredging Company ("NDC"). He now suffers from an incurable eye condition, glaucoma, that will not get any better, but likely will get worse absent continued medical treatment. Based on the evidence introduced by the parties at a bench trial, the Court **FINDS** that Wiley reached maximum medical improvement in September 2004 and **HOLDS** that once this standard is achieved, a shipowner is not required to pay for subsequent medical treatment necessary to maintain the MMI level of recovery. The Court therefore will enter a declaratory judgment absolving NDC of liability to Wiley for post-September 2004 payments of maintenance and cure. The Court also will enter judgment in favor of NDC on Wiley's counterclaims.

## I. Findings of Fact

On November 27, 2003 Wiley was working as a deckhand aboard NDC's dredge CHARLESTON, located near Wilmington, North Carolina. A towing line parted and struck him in the face, thereby injuring his nose and left eye. Wiley spent the majority of the following month (December 2003) in a hotel near New Hanover Hospital in Wilmington while undergoing treatment for his injuries. He was hospitalized intermittently during this period of time.

Wiley thereafter returned to his home near Savannah, Georgia where he continued to receive treatment for his injuries. Dr. Judith M. Piros, an ophthalmologist, treated Wiley's eye injury.

Dr. O. Emerson Ham, a neurologist, treated Wiley's complaints of dizziness and pain above his left eye.

    A.    <u>Treatment by Dr. Piros (Ophthalmologist)</u>

Dr. Piros began treating Wiley on January 6, 2004. She diagnosed him as suffering from glaucoma of the left eye, which was caused by the November 27, 2003 injury. Glaucoma is an incurable disorder of the eye characterized by an increase of intraocular pressure. The eye pressure increases because the fluid (aqueous humor) within the eye no longer drains out at the same rate that it is produced.[1] Elevated intraocular pressure results in damage to the optic nerve and may ultimately lead to blindness if left untreated.

Normal eye pressure ranges between 10 and 21 millimeters of mercury. Once a glaucoma patient's eye pressure is controlled and temporarily stable, nothing else can be done to improve his or her condition. The treatment modality for glaucoma patients becomes one of lifetime follow-up visits to identify occurrences of intraocular pressure above 21 millimeters. Intraocular pressures of stabilized glaucoma patients may become elevated

---

[1] In a healthy eye, the aqueous humor drains from a structure known as the trabecular meshwork, which is "a group of tiny canals through which most of the fluid in the eye drains." WebMD, A-Z Health Guide From WebMD, http://www.webmd.com/hw/health_guide_atoz/stt11397.asp?navbar=hw158193 (last visited Dec. 15, 2005). Defendant Wiley's trabecular meshwork does not drain properly and, as a result, causes elevation of his intraocular pressure.

above normal range at any time for the rest of their lives.

Dr. Piros initially treated Wiley's glaucoma with medication drops.  For more than four months (March - July 2004), Wiley's intraocular eye pressures for his left eye remained stable between 13 and 21 millimeters of mercury.

When Dr. Piros evaluated Wiley on July 12, 2004 she determined that his glaucoma had stabilized.  Dr. Piros therefore shifted Wiley's care to a follow-up treatment modality and set his next appointment on November 8, 2004 (four months later).  On September 22, 2004, Dr. Piros orally advised NDC that Wiley had permanent glaucoma; that he reached maximum medical improvement; and that he could return to full duty.  She memorialized her medical opinion in a letter to NDC dated September 29, 2004.  Her letter states "[m]y opinion is that he has reached maximum medical improvement, but I do need to emphasize that as a result of his injury, he does have permanent glaucoma and will continue to have this."  (Transcript of Dr. Piros Dep., Ex. 3).  NDC paid for all medical treatment provided by Dr. Piros up to this date.  It thereafter refused to make further payments of maintenance and cure.

When Wiley was seen by Dr. Piros at his follow-up visit on November 8, 2004, she noted that the pressure in his left eye had once again become elevated.  She referred Wiley to Dr. Russell Dandy for a second opinion.  Dr. Dandy recommended a trabeculectomy, which is a surgical excision of a small portion

of the chamber of the eye.  The opening is then covered with a flap of tissue from the white part of the eye in order to facilitate drainage of aqueous humor and thereby relieve the glaucoma.  "As the fluid flows through the new drainage opening, the tissue over the opening rises to form a little blister or bubble, called a bleb."  WebMD: A-Z Health Guide from WebMD: Trabeculectomy (filtration surgery) for glaucoma, http://www.webmd.com/hw/vision /hw15419.asp (last visited Dec. 15, 2005).

On December 22, 2004, Dr. Piros performed a trabeculectomy on Wiley.  Unfortunately, the trabeculectomy did not work.  Wiley's intraocular pressure remained elevated at his follow-up visits: 24 millimeters on January 10, 2005 and 34 millimeters on January 18, 2005.  Dr. Piros determined that Wiley's poor drainage was due to scarring.  A common complication of a trabeculectomy procedure, especially in African American patients, is the development of scarring on the bleb.  This scarring prevents the desired drainage.

Dr. Dandy was again consulted and determined that a needling[2] of Wiley's bleb was necessary.  He performed this procedure on February 11, 2005.  Wiley's intraocular pressure has since remained within the normal range.

---

[2] Needling of the bleb is a procedure in which an ophthalmologist uses a needle to break up the scar tissue and allow the aqueous humor to resume drainage through the bleb.

On January 25, 2005, Dr. Piros issued a letter to Wiley's counsel that seemingly contradicted her earlier declaration that Wiley had reached MMI. The letter states:

> Dear Mr. Rabinowitz,
>
> In response to your most recent letter, no, Mr. Wiley has not yet reached maximum medical improvement in regards to the condition that he has.  His intraocular pressure is still not well controlled, and in fact, on December 22, he underwent trabeculectomy surgery to try to lower the pressure.  For the first few weeks, this seemed to work well, however, his pressure is spiking back up to the 34mm Hg range, and as a result, I sent him to Doctor Russell Dandy, here in Savannah, who is a glaucoma specialist. . . . I am hoping that once Mr. Wiley's intraocular pressure gets under control, he will no longer have any significant pain, although it is very hard to predict with these glaucoma patients, what course their eye takes, especially because he is as young as he is, his scarring response may be significantly more aggressive than would otherwise be thought.  As far as I can tell at this time, Mr. Wiley does not have any permanent residual from his injury, however, again, it is difficult to answer that because we don't know how his glaucoma will settle out.  If his pressures remain in the elevated range that they are in now, then yes, he will go on to suffer permanent vision loss.  At this moment in time, he does not have any permanent residual.

(Def. Ex. 18).  Dr. Piros did not explain in her letter how Wiley's condition could improve beyond what had been achieved as of September 2004.  At her deposition, Dr. Piros testified that her January 25, 2005 letter was not a retraction of her previous letter; she instead was communicating that Wiley had not achieved MMI from the relapse detected on November 8, 2004.  That relapse led to the trabeculectomy and subsequent needling of the bleb.

B.  <u>Treatment by Dr. Ham (Neurologist)</u>

Dr. Ham, a neurologist, treated Wiley from January 13, 2004 until July 6, 2004. Dr. Ham found Wiley to be neurologically intact upon his initial physical exam. However, because Wiley still complained of pain and dizziness, Dr. Ham had him undergo a battery of diagnostic studies, including a magnetic resonance imaging ("MRI"), a magnetic resonance arteriogram ("MRA"), an electronystagmography ("ENG"), audiometric studies, and brain stem evoked response studies. None of these diagnostic tests revealed any neurological abnormalities.

Dr. Ham referred Wiley to Dr. Fred Daniel, an ear, nose, and throat specialist, for evaluation of his pain and dizziness complaints. After seeing defendant Wiley several times, Dr. Daniel suspected that Wiley's complaints of pain were neurological in nature and returned him to Dr. Ham's care in June 2004.

Dr. Ham determined that, from a neurological perspective, Wiley had no loss of sensation and no loss of motor function. Dr. Ham concluded that Wiley's complaints of pain were due to a probable bruising of the supraorbital nerve, and, as a result, he wrote in an office note dated July 6, 2004 that Wiley was "capable of returning to work of any sort that he wishes . . . and that he [had] no neurological or intracranial abnormalities to be concerned about." Even though Wiley continued to complain of pain, Dr. Ham concluded that from a neurological perspective,

Wiley had reached MMI as of July 6, 2004.

Dr. Ham's and Dr. Piros' testimony and reports, when taken together, establish that Wiley reached MMI no later than September 23, 2004 and thereafter was physically able to return to duty.

## II. Conclusions of Law

### A. Maintenance & Cure Obligation

While it is undisputed that Drs. Piros and Ham both concluded that Wiley had reached MMI no later than September 2004, Wiley in essence argues that their conclusions were simply an intermediate step in a longer process. The November follow-up visit suggested the need for further treatment that would not only solve the immediate problem (i.e., elevated intraocular pressure), but may make future relapses less frequent and less severe. This case thus poses the legal question of whether a shipowner is obligated to pay for such continuing care as is necessary to keep the seaman's condition stable at the MMI level of recovery. To answer this question, the Court must examine the history of and purposes underlying the shipowner's duty to provide maintenance and cure.

The duty of maintenance and cure originated in the ancient maritime codes as a master's obligation to provide for seamen who fall sick or are wounded in service of the ship. See the Laws of Oleron, Arts. VI & VII; the Laws of Wisbuy, Arts. XVIII, XIX, &

8

XXXIII; the Laws of the Hanse Towns, Arts. XXXIX & XLV; the Marine Ordinances of Louis XIV, Arts. XI, XII, & XV.  In the United States, the duty is "an implied provision in contracts of marine employment."  Aguilar v. Standard Oil Co. of New Jersey, 318 U.S. 724, 730 (1943); see also, Calmar S.S. Corp., 303 U.S. at 527.  This contractual orientation comports with the ancient maritime codes as they also placed reciprocal obligations upon shipowners and seamen.  See the Laws of Oleran, Art. VI; the Laws of Wisbuy, Art. XVIII.  For example, under the Laws of Wisbuy, a seaman who is wounded ashore during a diversion from the ship's service "shall be obliged to refund what he has received, and besides to pay what the master shall be forced to pay over and above to another whom he shall hire in his place."  The Laws of Wisbuy, Art. XVIII.

Justice Story, then on circuit, best described the need for and purpose of the maintenance and cure duty, stating:

> Seaman are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour.  They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence.  If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. . . . [I]f these expenses are a charge upon the ship, the interest of the owner will be immediately connected with that of the seaman.  The master will watch over their health with vigilance and fidelity. . . . Beyond this, is the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation. . . . Even the merchant himself derives an ultimate benefit from what

> may seem at first an onerous charge. It encourages seaman to engage in perilous voyages with more promptitude, and at lower wages.

Harden v. Gordon, 11 F. Cas. 480, 483 (C.C.D. Me. 1823) (No. 6,047).

American common law initially limited the duration of maintenance and cure payments to completion of the "voyage," The Osceola, 189 U.S. 158, 175 (1903), or to the duration of the seaman's contract, Nevitt v. Clarke, 18 F. Cas. 29, 32 (S.D.N.Y. 1846). In 1936, the United States abrogated the common law by adopting the General Conference of the International Labor Organization, Shipowner's Liability (Sick and Injured Seaman) Convention, 54 Stat. 1693 (1936).[3] The Convention states, in pertinent part:

> The shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, <u>or until the sickness or incapacity has been declared of a permanent character</u>.

Shipowners' Liability (Sick and Injured Seamen) Convention, Art. 4, ¶1 (1936), 54 Stat. at 1696 (emphasis added). Read literally, the Convention works a harsh result in those cases where the permanent character of an injury is readily apparent. For example, accidental amputation of a limb is readily declared permanent, perhaps even before the bleeding stops.

---

[3] "The aim of the Convention 'was not to change materially American standards but to equalize operating costs by raising the standards of member nations to the American level.'" Vella v. Ford Motor Co., 421 U.S. 1, 5 (1975) (quoting Warren v. United States, 340 U.S. 523, 527 (1951)).

The next year, in 1937, the Supreme Court issued its landmark maintenance and cure ruling in <u>Calmar S.S. Corp.</u>  The Supreme Court held that the duty continues beyond the voyage "to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment."  303 U.S. at 530.  The <u>Calmar</u> opinion made no reference to the 1936 Convention, probably because Congress adopted it after the case was filed.

In <u>Farrell v. United States</u>, 336 U.S. 511 (1949), the Court ameliorated the potentially harsh result worked by the Convention by indirectly reconciling the Convention with the reasonableness standard adopted in <u>Calmar</u>.  The Court interpreted the Convention language in light of American common law to extend the duty of maintenance and cure until such time as the seaman is "so far cured as possible."  <u>Farrell</u>, 336 U.S. at 518-19.

Rather than creating a new substantive rule, <u>Farrell</u> simply fixed the point in time at which the shipowner could cease maintenance and cure payments for permanent injuries.  The Court decreed, somewhat arbitrarily, that an incapacity or illness is declared permanent at the time that maximum cure has been achieved.  <u>Id.</u> at 518-19.  Since <u>Farrell</u>, this benchmark has been restated as the point in time at which further medical treatment probably will not improve the seaman's condition.  This point in time is now commonly referred to as a determination of "maximum medical improvement."  <u>See</u> <u>Salem</u>, 370 U.S. at 38; <u>Vaughn</u>, 369

U.S. at 531; Pelotto, 604 F.2d at 400.

Wiley relies on Calmar to encourage the Court to extend the duty of maintenance and cure to an indeterminate point in time beyond MMI. While defendant Wiley accurately cites Calmar as having left open the possibility of extending the duty if physical injury occurs in service of the vessel (as opposed to acquisition of a disease), Farrell foreclosed that possibility and no Court has ever accepted the Calmar Court's musing. See Farrell, 336 U.S. at 515 ("We think no such distinction exists or was premised in the Calmar case.")

Maintenance and cure was not intended as a pension or disability plan. Farrell, 336 U.S. at 519. Instead, the contractual origins of the implied duty demonstrate that its purpose was to strike a balance that both promotes marine commerce and protects seamen. The fulcrum of that balance was fixed by the 1936 Convention and the Supreme Court's interpretation of it in Farrell. Absent a Congressional mandate, further extension of the duty of maintenance and cure would be improper.

### B. Maintenance Rate

Wiley has asserted a counterclaim for an increased daily maintenance rate. NDC paid him the $20 per day maintenance rate set by the Labor Management Agreement negotiated between NDC and Wiley's union. Wiley asserts that this is not adequate

reimbursement for his daily room, board, and utilities.

"Courts generally have decided that it is more appropriate . . . to enforce privately negotiated contractual rates of maintenance, rather than engaging in overt legislation of particular dollar figures." Zawkari v. Am. S.S. Co., 871 F.2d 585, 588 (6th Cir. 1989). In order to depart from the rate set by the collective bargaining agreement, defendant Wiley must show that the agreement "as a whole was unfair or that the union did not adequately represent him." Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1291 (11th Cir. 2000). Since Wiley has made no such allegation or showing, the Court upholds the $20 per day maintenance rate set by the collective bargaining agreement.

    C.   <u>Mileage as Portion of Cure</u>

A shipowner's duty of cure includes reimbursement of reasonable travel expenses to and from medical care. See Barnes v. Andover, 900 F.2d 630, 644 (3rd Cir. 1990); Travis v. Motor Vessel Rapid City, 315 F.2d 805, 813 (8th Cir. 1963). Wiley has asserted a counterclaim seeking reimbursement for travel expenses incurred while receiving medical treatment during the period in which plaintiff NDC was obligated to pay maintenance and cure. Wiley did not maintain contemporaneous records of his mileage and instead introduced into evidence printouts from the website

mapquest.com[4] which purport to show the distances between his home and various doctors' offices.

Even if the Court were to hold that contemporaneous mileage records are unnecessary, Wiley's counterclaim still would fail. Wiley has not quantified how many visits he made to each medical office nor has he provided a calculation of the total miles traveled for which he seeks reimbursement. After reviewing the record, the Court is unable to quantify the number of miles traveled to and from Wiley's various medical appointments. Accordingly, the Court is unable to award travel expenses, even though Wiley otherwise would be entitled to such a recovery.

## IV. CONCLUSION

For the reasons set forth above, the Court rules as follows:

1. The Court **GRANTS** plaintiff NDC's request for declaratory judgment and **DECLARES** that Norfolk Dredging Corporation is not obligated to pay any further maintenance and cure to defendant John L. Wiley for injuries he suffered aboard its vessel on November 27, 2003. The Court **DENIES** defendant Wiley's counterclaim for payment of maintenance and cure after September 23, 2004.

---

[4] Mapquest.com is an internet service which provides driving directions from any starting to stopping points selected by a user. The driving directions also include a calculation of the total estimated time of travel and total miles of the trip.

2. The Court **DENIES** defendant Wiley's counterclaim for payment of maintenance at the rate of $30/day rather than the union-agreed rate of $20/day.

3. The Court **DENIES** defendant Wiley's counterclaim for payment of transportation costs for obtaining medical treatment.

4. The Court **DENIES** defendant Wiley's counterclaim for money damages for the emotional and physical injuries allegedly sustained due to the termination of maintenance and cure.

5. The Court **DENIES** defendant Wiley's counterclaim for reasonable attorney's fees.

The Clerk is hereby **DIRECTED** to enter judgment in accordance with this Opinion and Order and forward a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

                                                   /s/
                                          Walter D. Kelley, Jr.
                                  UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September 29, 2006